Booth, Chief Justice,
delivered the opinion of the court:
This Indian case is before the court in pursuance of the. special jurisdictional act appearing in finding I. The Choctaw Nation of Indians sues to recover a large sum of money, predicating this cause of action upon a contention that the per capita distributions of communal funds of the nation to Mississippi Choctaw Indians were made by accredited officials of the United States without warrant of law and contrary to the provisions of Indian treaties. and acts of Congress relating to the' monetary estate of the nation.
Congenitally, there is no distinction between a Mississippi Choctaw Indian and any other Choctaw. Both were members of the aboriginal Choctaw Tribe when it settled at a very early date in what is now the State of Mississippi, and remained as such until the separation of the tribe in 1830 and the years following. The Choctaw Indians who remained in Mississippi after a majority of the tribe emigrated t o Indian Territory came to be known as Mississippi Choctaws.
The Choctaw Tribe, like other southern and eastern tribes, became the subjects of a persistent movement to remove them from their native habitat to reservations created for them in Indian Territory. As to the Choctaws, the removal effort became acute when Mississippi was admitted as a State in 1817. The tribe claimed by right of occupancy an extensive landed estate within the boundaries of the State, and their holdings, as well as presence as a tribe, were deemed inimical to the future development and advancement of the same. In 1820 a treaty was concluded with the tribe providing for their removal to a delimited reservation in Indian Territory, and in 1825 a treaty of the same purport was made. Nevertheless, the Indians did not remove. Finally the United States determined to remove the Indians, and a commission was duly appointed to meet and negotiate a treaty with the tribe at a place known as Dancing Rabbit Creek.
On September 27, 1830, the efforts of the commission were successful, and on the above date the Dancing Rabbit Treaty *15 was concluded. The treaty provided for a delimited reservation for the tribe in Indian Territory, and for enumerated benefits and annuities to be paid for a stated period of years. A large number of Choctaws would not assent to any provision in the treaty compelling them to remove from Mississippi, an opposition formidable enough to prevent the conclusion of the same, and, in order to placate the discontents, article XIY was inserted in the treaty and it is this article which occasions this litigation, as well as preceding cases involving the same.
Article XIY of the treaty is as follows:
“ Each Choctaw head of a family being desirous to remain and become a citizen of the States, shall be permitted to do so, by signifying his intention to the agent Avithin six months from the ratification of this treaty, and he or she shall thereupon be entitled to a reservation of one section of six hundred and forty acres of land, to be bounded by sectional lines of survey; in like manner shall be entitled to one-half that quantity for each unmarried child which is living with him over ten years of age; and a quarter section to such child as may be under 10 years of age, to adjoin the location of the parent. If they reside upon said lands intending to become citizens of the States for five years after the ratification of this treaty, in that case a grant in fee simple shall issue; said reservation shall include the present improvement of the head of the family, or a portion of it. Persons A\'ho claim under this article shall not lose the privilege of a Choctaw citizen, but if they ever remove are not to be entitled to any portion of the ChoctaAv annuity.”
The article is seemingly free from ambiguity. The rights conferred are positive ones, defined with a degree of precision apparently incapable of misapprehension, and notwithstanding this fact the large number of Indians who remained in the State were subjected to a series of maladministration of the article by accredited representatives of the United States that in and of itself discloses an inexcusable, cruel, and unjust procedure never excelled, if equaled, in the history of Indian affairs. Not to exceed 143 heads of families, embracing 276 individual Indians, ever received an allotment under article XIY, and at least 1,155 heads of families embracing at least 3,800 individual Indians were by intimidation, false entries, *16 and destroyed documents cheated out of and denied their rights.
The majority of the tribe emigrated to the West and from time to time Mississippi Choctaws joined it. The Choctaw Nation West welcomed their coming. Knowledge of the unhappy and destitute situation of their brethren in the East and the manner of their treatment justly inspired a memorial of the nation directed to Congress as late as 1889 asking Congress to make adequate provision for the removal of Mississippi Choctaws to the western reservation, and in 1891 the national council of the nation made a very generous appropriation from the nation’s funds to pay the expenses of the removal of certain Mississippi Choctaw families to the West. There is not in the record the slightest proof or suggestion that the Choctaw Nation either sought to prevent the removal of any Mississippi Choctaws to the nation, or in any manner discriminated against those who did join the nation, except as to annuities due under the treaty 1830, until about 1893 when Congress determined upon a course of allotting to the members of the nation their reservation lands in severalty.
March 3,1893, Congress created the Dawes Commission (21 Stat. 645). This tribunal was expressly charged with the duty of conducting negotiations and agreements with the Five Civilized Tribes, of which the Choctaw Nation was one, for the cession of their tribal lands to the United States or their allotment to the Indians in severalty. The primary purpose of the. legislation was the extinguishment of Indian tribal lands in order to prepare the way for the admission of the State of Oklahoma into the Union. The commission established headquarters in the Indian country and subsequently made a very comprehensive report of its proceedings to Congress.
June 10,1896, Congress directed the Dawes Commission to make a roll of the Five Civilized Tribes (29 Stat. 339). In making the roll Congress prescribed express directions with reference to additions to be made to the existing roll, which it confirmed. Indian laws, customs, and treaty provisions were to be observed, except when the laws or customs contravened the laws of the United States, and the way to secure enrollment by claimants seeking the same was pointed out. *17 An appeal to tbe United States courts was granted from any adverse decision with respect to any applicant’s right to be enrolled.
Both the history of tribal organizations and legal precedents confirm the statement that the preparation of a strictly authentic roll of tribal Indians is a task fraught with disputation, contest, and, in many instances, deceptive statements and practices. Tracing the ancestry of individual and family applicants becomes much more involved when the prospect of securing a landed estate appears and innumerable applicants file claims, and this precise situation resulted from the passage of the act of June 10,1896, supra.
The Dawes Commission immediately commenced proceedings to enroll the Choctaw Indians entitled as citizens of the Nation to the benefits of the legislation heretofore noted, and at a very early' date following the passage of the act of June 10,1896, there not only arose vigorous contests as to the degree of Indian blood an applicant should possess to be entitled, but the claims of the Mississippi Choctaws to the right of enrollment came into being. Manifestly the enrolled Choctaws were justly alert to protect the rolls, and the commission proceeded cautiously in enlarging the rights of applicants, especially so as to the Mississippi Choctaws.
On June 7, 1897 (30 Stat. 83), Congress directed the commission with respect to the claims of the Mississippi Choctaws to enrollment as follows:
That the commission appointed to negotiate with the Five Civilized Tribes in the Indian Territory shall examine and report to Congress whether the Mississippi Choctaws under their treaties are not entitled to all the rights of Choctaw citizenship except an interest in the Choctaw annuities.”
The commission discharged this duty and subsequently reported to Congress January 28, 1898.-'
This report reflects an exhaustive investigation into; the facts and law as to the enrollment of Mississippi Choctaws. The findings recite that before a Mississippi Choctaw should be enrolled it must be established that the applicant is a descendant of a Choctaw Indian provided for in article XIY of the Dancing Eabbit Creek Treaty, and “ has in good faith joined his brethren in the territory with the intent to be *18 come one of the citizens of the nation.” This conclusion of the Commission was in accord with the opinion of Judge Clayton in the case of Jack Amos et al. v. The Choctaw Nation, involving this precise question of the necessity of removal from Mississippi or elsewhere to the nation in order to entitle a Mississippi Choctaw to enrollment. The Commission reported, however., that in view of the expiration of the time limit for enrollment it could not proceed further without enabling legislation.
In June 1898 (30 Stat. 495, 503), Congress enacted the so-called “ Curtis Act.” As pertinent to the issue in this case, this act was the enabling legislation the Dawes Commission suggested in its report of January 28, 1898, and by its provisions the Dawes Commission was authorized to determine the identity of XIYth article Choctaw applicants for enrollment as citizens of the Choctaw Nation in accord with the terms and conditions stated by the Commission in its report as to Mississippi Choctaws, and such applicants as established their rights under treaties or laws of the United States were to be enrolled.
In December 1898 the Commission gave extensive public information in Mississippi to all Indians there residing, as to their rights to enrollment, and later A. S. McKennon, one of the members of the Commission, went personally to the State, investigated the claims of applicants, and reported that 1,923 Mississippi Choctaws were entitled to enrollment as citizens of the Choctaw Nation. Commissioner McKen-non proceeded upon the theory that all full-blood Mississippi Choctaws whose ancestors were living in Mississippi on September 27, 1830, the date of the Dancing Rabbit Creek Treaty, were entitled, and the Commission later approved his roll, subsequently withdrawing its approval when the Secretary of the Interior disapproved it.
In December 1900, a second commission was sent to Mississippi. The disapproval of the McKennon roll made the second investigation indispensable. This commission proceeded with careful deliberation to observe the terms and conditions of the report of the Dawes Commission of January 28,1898, and continued its sessions until August 1901.
*19 In the meantime, on May 81,1900 (31 Stat. 236), Congress provided:
“ That any Mississippi Choctaw duly identified as such by the United States Commission to the Five Civilized Tribes shall have the right, at any time prior to the approval of the final rolls of the Choctaws and Chickasaws by the Secretary of the Interior, to make settlement within the Choctaw-Chickasaw country, and on proof of the fact of bona fide settlement may be enrolled by the said United States Commission and by the Secretary of the Interior as Choctaws entitled to allotment: * *
The Commission by its construction of this provision enrolled six or seven Indians only, although six or eight thousand applied. To this provision the Commission applied a strict construction, holding that it operated prospectively and all applicants eligible must trace their ancestry to Mississippi Choctaw Indians who remained in Mississippi and received patents for lands under article XIY of the treaty of 1830.
In February 1901 the Commission and the Choctaw Nation formulated an agreement as to the right to enrollment of the Mississippi Choctaws. Congress declined to approve the same; later, however, a supplemental agreement was approved by the act of July 1, 1902 (32 Stat. 636, 651), and with respect to this act this court in the case of Winton v. Amos, et al., 51 C. Cls. 284, 292, said:
“ Congress further extended the right of enrollment to Mississippi Choctaw Indians duly identified for citizenship in the Choctaw Nation to any time prior to the approval of the final Choctaw rolls then in process of completion by the Dawes Commission, and if such identified Indians made bona fide settlement in the Choctaw country previous to said date the commission was directed to enroll them. This was in effect a substantial extension of time for removal to the Territory.
$ ‡ ‡ ‡
“ * * * however, by the agreement of March 21, 1902, which, with the amendments thereafter adopted by Congress and later ratified by the Choctaw Nation, concluded in all substantial respects the rights of the Mississippi Choctaws to citizenship in the western tribe. This contract, as amended and subsequently approved by Congress by the act *20 of July’l, 1902, is known as the Cboctaw-Cbickasaw supplemental agreement and closed in all important particulars this long and somewhat furious contest. In the end, by virtue of this agreement, Mississippi Choctaw Indians identified under the provisions of section 21 of the act of June 28, 1898 (Curtis Act), might at any time within' six months after the date of their identification by the commission make bona fide settlement within the Choctaw country, and upon proof of the same within one year after the date of identification should be enrolled as a Mississippi Choctaw, and upon approval of the rolls by the Secretary of the Interior became entitled to the same rights, privileges, and allotments of lands as the members of the Choctaw Nation. No application was to be received after six months from the passage of the act, and the commission was specifically directed to enroll ‘ all full-blood Mississippi Choctaw Indians and descendants of any Mississippi Choctaw Indians, whether of full or mixed blood, who received a patent of land under the said fourteenth article of said treaty of 1830 who had not moved to and made bona fide settlement in the Choctaw-Chickasaw country prior to June 28, 1898 All the aforesaid Mississippi Choctaw Indians were to be carried upon a separate roll.
# # . ❖
“ The final disposition of all Choctaw matters was provided for in the legislation of April 26,1906, 34 Stat. L., 137, providing for enrollment of the minors and descendants of deceased Indians and covering certain contingencies arising from death of a duly enrolled Indian.”
The difficulty which Congress encountered with reference to the Mississippi Choctaws was not so much the question of their right to enrollment as members of the Choctaw Nation, as was the question of their identification and their hereditary and treaty qualifications for enrollment. The Dawes Commission and the Choctaw Nation were startled over the vast number of applicants claiming the right to enrollment under the treaty of 1830. The legislation which culminated in granting the right to enrollment, by its terms, restricted it, not only in accord with a legislative purpose so to do, but in agreement with the Choctaw Nation that such a course accomplished justice to all concerned. There is, we think, no room for doubt that Congress in the beginning intended to recognize the right of the Mississippi Choctaws; the factor which prolonged the accomplishment of the right was doubt as to the number of Indians that were to be included.
*21 ' The plaintiff says that the right of enrollment granted to Mississippi Choctaws conferred no other interest in the property of the Choctaw Nation than a right to receive a landed allotment equal in extent and value to that given an enrolled member of the Choctaw Nation. To sustain the contention a differentiation is sought to be established between the rights of citizenship and the rights of members of an Indian nation. In the former it is said political rights only are bestowed; in the other, not only political but property rights attach. The contention is not a new one; it has been advanced in other Indian cases.
The plaintiff recites and analyzes in detail the history of the Indians involved, the treaties concluded by them, and the legislation resulting in the enrollment of the Mississippi Choctaws as indicative of a clear intent to restrict their acquired rights to an allotment of land only, without the right to any per capita distribution of the common funds of the nation. Eeference to this source of rights is of course an admission that no positive declaration of either a treaty or law of Congress definitely establishes it. With this contention we are unable to agree. Putting aside all consideration of moral or equitable principles involved, and adjudicating the issue upon the record in the light of established precedents, and what was as a matter of fact actually done, we think Congress intended to grant to Mississippi Choctaws all the rights incident to membership in the Choctaw Nation.
Eesorting as the plaintiff does to the history of the transaction, we find in 1830 an extensive Indian tribe occupying a large area of lands in the State of Mississippi. The State and the United States desire to accomplish its peaceable removal to the West to make way for white settlers. A treaty is essential and one is concluded after conferences and councils, and in order to bring about harmony and do justice to a considerable number of Indians who wish to remain in the State, article XIY is agreed to and inserted in the treaty.
Article XIY of the treaty is significant in meaning. Tribal Indians were loath to expatriate themselves from the tribe. Setting forth a way in which it might be done was to say the least novel and experimental. To leave open a way by which the Indians did not lose their citizenship in the tribe was not *22 only consonant with Indian tradition but in direct harmony with the primary purpose of the treaty which was to accomplish the removal of all the members of the tribe. To leave a considerable number of tribal Indians in a State hostile to their presence, without the means of rejoining the tribe, was, we think, never contemplated by either the Indians or the treaty makers.
The plaintiff emphasizes alleged inequities accruing out of the treaty of 1830, and argues that it was never intended to vest title to lands in Mississippi in the Mississippi Choctaws and give them in addition membership in the nation west if they removed to the reservation; that to do so increases the privileges of the Mississippi Indians by giving them a larger landed estate than the Choctaw Indians who removed to the West and also points out the amount of per capita payments the Mississippi Choctaws received. We need not discuss the matter of allotments; this issue disappears from the case. Congressional legislation settles it, and as to claimed inequities, the case of the United States v. Mille Lac Indians, 229 U. S. 498, 500, settles it. The court is limited to the terms of the treaty and acts of Congress. In the Mille Lac case the Supreme Court, speaking of the jurisdictional act, said:
“Nor does it contemplate that recovery may be founded upon any merely moral obligation, not expressed in pertinent treaties or statutes, or upon any interpretation of either that fails to give effect to their plain import, because of any supposed injustice to the Indians.”
This case is to be decided upon the single issue, i. e., whether the legislation of Congress, which admittedly granted to Mississippi ChoctaAv Indians landed allotments out of the nation’s reservation, includes within its scope and intent a grant of membership in the nation to the Mississippi Choctaws which admittedly carries with it a right to a per capita share of the common funds of the same. The mere statement is a complete demonstration of the fact that the acts of Congress authorizing the enrollment of Mississippi Choctaws emanated from the provisions of article XIY of the Dancing Babbit Creek Treaty of 1830. It was this article of the treaty which reserved to Mississippi Choctaws *23 “ the privilege of a Choctaw citizen.” It was upon this article that the persistent agitation of their rights in the nation was based, and upon which appeals were made to Congress to enact the legislation which granted enrollment. The initiatory claim of the Mississippi Choctaws to the right of enrollment upon the nation’s rolls was a legal one, and the congressional recognition received was, we think, intended to grant it as claimed.
With the above in view we think it in nowise essential to discuss the many extraneous issues raised in plaintiff’s brief. What was the claim of the Mississippi Choctaw Indians and what was the extent of the rights granted them by Congress ? In 1893 and the years following, Congress was engaged in dividing the estate of the Choctaw Indians among those entitled to receive it. It was an extensive estate of more than sufficient proportions to give to each Indian entitled a quantity of land ample for his livelihood and needs, and leave a generous surplus to be converted into cash. The landed estate was not all the nation possessed; accumulated funds from various sources stood to its credit.
What the Mississippi Choctaws wanted was their share of this estate. There was but one way to obtain it in view of the existing situation, and that was to secure the right to be enrolled as citizens and members of the Choctaw Nation. The fact that Mississippi Choctaws were enrolled upon a separate roll augurs nothing. The act which gave the right 'to enrollment established conditions to be met and necessitated segregation. A separate roll accomplished no more. It did not work to diminish or increase their interests, everything else being equal.
So long as aboriginal tribal organization prevailed, the legal distinction between political and property rights in the tribal property was decidedly insignificant, if it obtained at all. In the very early history of the race the marriage of an Indian woman to a white man, or a white woman to an Indian, must have been infrequent. Later on, as the contacts of the race with the white settlers became more frequent and intimate, intermarriages multiplied, and due to this fact the Indian tribes themselves first set up a code to govern *24 the rights of the whites who thus came into the tribe, and from then on a distinction between property rights and the right to reside upon the reservation obtained, and in later years gave rise to legislation upon the subject, and to litigation as well. Red Bird v. United States, 203 U. S. 76, 25 Stat. 392.
As Indian reservation lands became more valuable and the race advanced in civilization, tribal organization became more definite. Written constitutions and laws were adopted by tribal legislative bodies modeled usually upon State and national political organizations and the distinction between a native of the tribe and one who came into it, though foreign thereto by birth, became the subject of positive laws, generally discriminating as to a foreigner, be he white or Indian. In other instances when two distinct tribes were united or placed upon the same reservation, the proceedings to effect the same provided as to the respective property rights of each in both the landed estate and communal funds. The Negro slaves of Indian tribes were not members of the same. The adoption of one into a tribe did not of itself confer rights of property. No doubt exists that Indian laws and tribal tradition provided for the property rights of full-bloods upon a different basis from those not members of the race and those of half or lesser degree of Indian blood. In this case the treaty of June 22,1855 (11 Stat. 611), between the Choctaws and Chickasaws exemplifies the principle we state.
In 1830 the United States was negotiating with a cohesive’ tribe of native Indians. The fact has not been traversed that all of them were citizens, residents and members of the tribe, each entitled to tribal rights upon an equal basis. The necessity for any provision discriminating as to their property rights grew out of the attachment of certain individual members of the tribe to their native habitat. The Indians and the United States were in agreement that a right to remain in Mississippi should be granted, with an express reservation that those who did remain might, under the conditions named, regain the exact tribal status quo that existed on the date the treaty was concluded. The only property loss to be suffered by those who did remain was a denial of participation in the annuities provided for in the treaty.
*25 It is conceded by the plaintiff that in 1830 neither the Indian tribe nor the United States anticipated a division of the Indian Territory reservation in severalty among the Indians. The tribe possessed no accumulation of Indian funds, and there is no evidence in this record, or statements in the history of the Choctaws which we can discover, that in designating a native member of the tribe as a “ citizen ” it was intended to limit the rights of such to only political and not property rights. As between native members of the tribe, as we have attempted to point out, no necessity existed for so doing, and no contention to that effect was ever advanced by either the nation or anyone else until the property rights of members became valuable.
The plaintiff in its brief challenges all that we have said and supports the challenge by a recitation of alleged numerous privileges conferred upon a citizen of the tribe from a political aspect. The right to vote, to receive the protective features of the treaty and the beneficent guardianship of the United States in the way of regulating the relationship between the whites and the Indians on the reservation — all these and many more — accrue to a resident Indian under the treaty. The treaty., it is true, provided generously not only for the personal welfare of the Indians and also for means to encourage agriculture as well, but all these so-called “ privileges ” in no way contributed to the livelihood of one, if all he acquired was the right to live among his brethern, bereft of ownership in the communal estate upon which he lived and without the means to acquire an acre of its lands or one cent of the communal funds. In 1830 and for many years thereafter the so-called “ political privileges ” were many but far from substantial, from the standpoint of living expenses. We do not believe that either the members of the Choctaw Nation or the United States ever intended to project into the nation a subordinate class of native Indians vested with rights to determine the management and disposition of a vast Indian estate and domestic affairs, without the slightest property interest therein.
The acts of Congress which authorized the Dawes Commission to enroll the Mississippi Choctaws upon the rolls of the Choctaw Nation were distinct and express recognition of *26 the rights of said Indians reserved to and conferred upon them by article XIY of the Dancing Eabbit Creek Treaty of 1830. The act of June 7, 1897 (30 Stat. 62, 83), authorized an investigation by the Dawes Commission as to the rights of Mississippi Choctaws under their treaties. The report of the Dawes Commission recognized their treaty rights to enrollment, and finally, without again reviewing the legislative history, the supplemental agreement of 1902 closed the controversy and expressly provided for “ the enrollment of those persons identified by the Dawes Commission as Mississippi Choctaws entitled to benefits under article XIV of the treaty” of 1830.
We have set forth in the findings excerpts from the supplemental agreement as well as from the acts of April 28, 1904, and August 1, 1914. The acts speak for themselves. Each provides in careful detail as to enrollment and distribution of tribal property and nowhere evinces a legislative intention to withhold from Mississippi Choctaws any portion of the Choctaw Indian estate then or thereafter to be distributed.
The officials of the United States who administered the acts and authorized the per capita distributions made to Mississippi Choctaws did so in pursuance of the terms of the same. They at the time, so far as the record advises us, encountered little opposition from the nation or those chosen to represent it, and we think the distributions were lawfully made.
A second issue is raised by plaintiff, predicated upon an alternative claim, i. e., granting that the act of 1902 conferred membership in the nation to the Mississippi Choctaws enrolled thereunder, nevertheless, under the law they were not to receive any per capita payments from tribal funds accumulated by the nation prior to that date and on hand when they were admitted to enrollment. The Comptroller of the Treasury decided adversely to the contention, and, as previously stated, tire officials of the Government have acted in accord with this opinion.
The plaintiff argues that the Mississippi Choctaws did not become members in any event until March 4, 1906, the date when the Secretary of the Interior finally approved the rolls, *27 and not 1902, when the supplemental agreement as to enrollment became effective. Sections 41, 42,43, and 44 of the supplemental agreement of 1902 (32 Stat. 651) provided for a three-year continuous residence of Mississippi Choctaw allot-tees and satisfactory proof of the same before the allottee might receive a patent for his land. The plaintiff, citing this and other provisions of the agreement, draws a conclusion that the Mississippi Choctaw did not in fact become a member of the nation prior to the expiration of this residence period, and perhaps not until the final rolls were approved by the Secretary of the Interior.
The manifest intent of the Mississippi Choctaw provisions of the act of 1902 -was to secure the good faith of the allottee and preclude the possibility of any one of them acquiring an allotment without becoming a member of the nation. By attaching residential conditions to the grant of a patent for the allotment, the act contemplated the establishment of permanent membership. By its terms it did not affect the right to enrollment and allotment. What it did accomplish was a possible forfeiture of the same. The Mississippi Choctaws under the Dancing Rabbit Creek Treaty were to remove to the reservation, and this provision was construed by the Dawes Commission and the courts to require a removal with intent to rejoin the nation and become a member. Congress and the Indians were carrying out the provisions of article XIV of the treaty wherein the Mississippi Choctaws reserved their membership in the tribe.
The enrolled Mississippi Choctaws did have a right to their allotments, and the conditions imposed upon them different from native Choctaws obviously precluded alienation of the same during the residential period exacte. Blackwell v. Harts et al., 167 Pac. 325. As a matter of fact, the allottees moved upon their lands and did occupy them, and nowhere in this record does the fact appear that the 1,660 Choctaw Indians enrolled under the act of 1902 ever forfeited their allotments or failed to secure patents therefor.
The Indian funds of the nation disbursed in per capita payments to members were income and accumulations growing directly out of the landed reservation granted in 1830. *28 With one exception, we think the record sustains this statement. When allotments were to be made in severalty the surplus lands, including certain reservations from allotment of town sites, etc., were to be sold and the proceeds ultimately disbursed per capita among the enrolled members of the nation. Royalties from coal lands had accumulated and sums of money acquired in dealings with the Chickasaw Tribe of Indians. To set them forth in detail and amount is not necessary, as it is conceded that each enrolled Mississippi Choctaw obtained a per capita distribution out of these funds, amounting to $1,170.
The plaintiff in the brief makes this significant statement:
“ Prior to the time at which it became apparent that the tribal estate must be dissolved in order to make way for a new State, the Choctaws in many instances by the act of their national council admitted their relatives from Mississippi, but our contention is that persons so admitted took by virtue of the acts of the Choctaw Council and not by virtue of any rights contained in article XIV. After it became apparent that the Choctaw Council was to be discontinued and that the tribe was no longer to function as a government, it became necessary to outline the conditions upon which Mississippi Choctaws would be given any interest in the tribal estate.”
Assuredly, all these Mississippi Choctaws thus admitted into the tribe, participated in the per capita disbursements, now claimed as having been illegally made. The history of the Choctaw Tribe, of which we take judicial notice, a history bearing by age and circulation a high degree of accuracy, discloses that innumerable Mississippi Choctaws left Mississippi and emigrated to the reservation. Some, of course, returned; but many remained. Why should these obtain membership in the nation under article XIV of the 1830 treaty and those who came later be denied? The answer is contained in the excerpt from plaintiff’s brief.
This suit centers the contest upon those enrolled in virtue of the act of 1902 and leaves undisturbed those who emigrated under the treaty in preceding years. The status of the Indians is exactly the same. The landed and monetary wealth of the Choctaw Nation came to the Indians because *29 of their tribal nativity. In a large measure it was due to the discovery of valuable coal deposits, and the vast increase in value of reservation lands caused in part at least by the advance and proportions of white settlements.' It was communal property in the beginning and remained so until allotted and distributed. No one has ever disputed that a native member of the tribe was entitled, upon the basis of equality with every other native member, to his share of Indian property, and this, we think, is precisely what Congress intended to do in the passage of the legislation involved. ■ ... .
The committee, as well as the individual members immediately concerned in the passage of the acts, was familiar with Indian tribes and tribal property, and it is to us inconceivable that they intended to enroll the Mississippi Choctaws who were enrolled and deny these particular ones the benefits attaching to membership, because perchance they employed here and there the terms “ citizenship ” and “ membership.”
We have not cited or discussed the numerous cases appearing in the briefs. The authority of Congress to do what was done is not challenged, and the other cases cited disclose familiar principles of Indian law so often cited as to be distinctly familiar. We had before us an issue somewhat similar in the case of Winton et al., v. Amos et al., 51 C. Cls. 284 (supra), and while the court was reversed in part, as to disallowance of an attorney’s fee, what we said as to the effect of the act of 1902 we adhere to. It is as follows (pp. 338-339) :
“ Mississippi Choctaws became entitled to allotments in severalty and to participation in the Choctaw estate upon their being identified and enrolled. They must needs remove from Mississippi and take up a bona fide residence in the Choctaw-Chickasaw country. They were not required to act as a £ body ’ or ‘ group ’, but the act of identification, removal, and allotment called for individual action and volition. They applied for identification as individuals, and were identified as such; they were enrolled as individuals, and as individuals they received allotments of lands in severalty. They were neither identified nor enrolled at one or the same time; nor were they allotted lands together. Each of them upon complying with the provisions of the statutes in that regard *30 became a citizen of the Choctaw Nation entitled to all the rights, privileges, and immunities of Choctaw citizenship, except that they could not participate in Choctaw annuities. This exception probably fwrnished the occasion for the provision in the statute that the Mississippi Choctaws should be comed ‘ upon a separate roll? * * *
“The right to apply for identification, to be identified, to be enrolled, and ultimately to participate in the Choctaw estate, is one thing, involving different steps; and the possession and enjoyment of the estates granted is a different thing. It was the fact of removal to Indian Territory, the fact of being identified and subsequently enrolled, that actually fixed their status under the law.” (Italics supplied.)
The petition will be dismissed. It is so ordered.
Whaley, Judge/ Williams, Judge; LittletoN, Judge; and GeeeN, Judge, concur.