Williams, Judge,
delivered the opinion of the court:
TJnder an act of Congress approved May 26, 1920, 41,Stat. 623, the court was vested with jurisdiction “to hear and determine all legal and equitable claims, if any,” of the plaintiff Indians against the United States, “under any treaties, agreements, or laws of Congress, or for the misappropriation of any of the funds of said Indians, or for the failure of the United States to pay said Indians any money or other property due.”
The present suit was brought to recover the value of lands which the plaintiff Indians are alleged to have been deprived of by erroneous surveys made by officers and agents of the United States of the boundaries of their reservation as set forth in the treaty of October 14, 1864; and to recover additional compensation for 621,824 acres of land theretofore determined by the Boundary Commission of 1896 to have been erroneously excluded from the reservation.
The United States and the plaintiff Indians entered into a treaty in 1864 (16 Stat. 707), whereby plaintiffs ceded to the United States all their right, title, and claim to all their lands. Out of the lands so ceded by the treaty the following reservation was created and set apart as a home for the Indians:
Beginning upon the eastern shore of the middle Klamath lake, at the Point of Bocks, about twelve miles below the mouth of Williamson’s river; thence following up said eastern shore to the mouth of Wood river; thence up Wood river to a point one mile north of the bridge at Fort Klamath; thence due east to the summit of the ridge which divides the upper and middle Klamath lakes; thence along said ridge to a point due east of the north end of the upper lake; thence due east, passing the said north end of the upper lake, to the summit of the mountains on the east side of the lake; Whence along said mountain to the point where Sprague’s river is intersected by the Ish-tish-ea-wax creek; thence in a southerly direction to the summit of *623 the mountain, the extremity of which forms the Point of Kochs; thence along said mountain to the place of beginning.
In 1871 the outboundaries of this reservation were surveyed by one Mercer, an employee of the General Land Office. This survey was admittedly erroneous and excluded from the reservation a large amount of land which under the treaty should have been included therein. The Indians objected to the survey claiming that it did not delineate the borders of the reservation as agreed upon and set out in the treaty of 1864. The reservation was again surveyed in 1888 by one Thiel, also an employee of the General Land Office of the Interior Department. The Thiel survey followed exactly the Mercer survey of 1871 except for slight changes in the north and south boundaries. This survey was also erroneous and excluded a large area of land from the reservation as defined in the treaty. The Indians continued to protest and thereafter the President, pursuant to an act of Congress approved June 10, 1896, 29 Stat. 321, appointed a commission consisting of three members whose duty it was to investigate and determine the boundary lines of the reservation as the same had been established by th¡e treaty, and report its findings with respect to such boundary lines, and also to report the number of acres, if any, which had been excluded, and the value thereof. On December 18, 1896, the Commission made its report establishing the out-boundaries of the reservation as defined in the treaty creating the reservation. As a result of the findings of the Boundary Commission and the ensuing survey by one Elliott, a deputy United States surveyor, it was found that 621,824 acres of land had been erroneously excluded from the Reservation by the previous surveys.
Thereafter, on June 17, 1901, an agreement was made between the United States and the plaintiff Indians, which agreement was approved by the act of June 21, 1906, 34 Stat. 325, 367, 368, whereby the Indians ceded the 621,824 acres of land to the United States for the sum of $537,- *624 ■007.20,[1] which amount was duly appropriated by Congress, deposited in the Treasury to the credit of the Indians, and disbursed by the United States for their benefit in accord.ance with the provisions of the agreement.
The claims asserted by plaintiffs in the petition fall into two classifications: (1) Those predicated upon the alleged failure of the defendant to pay plaintiffs the actual value or adequate compensation for the 621,824 acres of plaintiffs’ reservation found by the survey, made pursuant to the report of the Boundary Commission, to have been erroneously excluded from the reservation by previous surveys, aggregating $3,184,137.80, and (2) claims predicated upon an alleged error of the Boundary Commission in failing to establish the outboundaries of the reservation according to the treaty provisions and as understood by the Indians, resulting in the exclusion therefrom of approximately an additional 805,400 acres, aggregating $4,626,411.25.
It is clear the claim falling under the first classification, viz, the alleged inadequacy of the compensation paid to plaintiffs for the cession of 621,824 acres of their land erroneously excluded from their reservation by early surveys of it by Mercer and Thiel, is without the jurisdiction of the *625 •court unless the effect of the agreement of June 17,1901, has been waived by the jurisdictional act. Plaintiffs contend ■that the jurisdictional act waives the estoppel of the agreement of 1901, approved by Congress June 21, 1906. The plaintiffs say “since the boundary controversy has existed from the date of the first survey in 1871 it is clear from the jurisdictional act that Congress intended to refer it to this , court for final determination,” and that “if the language of the act had left the matter in any doubt it would be dispelled by the reports of the Committees on Indian Affairs of the House of Kepresentatives and the Senate recommending the passage of the act.” The language of the report of the House committee, particularly pointed out by plaintiffs in the brief, reads:
It appears to the Committee on Indian Affairs that the Indians mentioned in said treaty of October 14, 1864, honestly believe that they have a good and bona fide claim against the Government, and it is the opinion of the committee that they are entitled to have their day in court, and that they should be permitted to take the above claims into the Court of Claims for final adjudication.
The “above claims” referred to by the House Committee on Indian Affairs are the claims of the plaintiff Indians theretofore particularly enumerated and described by the committee in the report and as set out by plaintiffs in their petition to the Secretary of the Interior urging that Congress “enact proper legislation which will enable them to employ attorneys to properly prepare and submit these claims to the Court of Claims for final adjudication.” The claim that there is a balance due plaintiffs because of the inadequacy of the compensation paid them for the cession of the 621,824 acres of land excluded from their reservation by reason of erroneous surveys was not among the “above claims” referred to by the House Committee. This claim was not presented to Congress and was not referred to by the House Committee in its report. It is not mentioned in any of the various documents considered by the committee, including the petition filed by plaintiffs in the ■office of the Secretary of the Interior in which plaintiffs’ *626 claims are set forth in great detail. In fact there is not a scrap of evidence in the entire record of the case that plaintiffs at any time, prior to the date of the filing of the petition in this case, ever asserted in any manner that they had a claim against the United States because of the inadequacy of the compensation paid them under the agreement of June 17, 1901, for the cession of the 621,824 acres of land involved. What plaintiffs represented to Congress when the jurisdictional act Avas being considered was that they had lost 1,082,880 acres of land by reason of erroneous surveys of their reservation; that in settlement under the agreement of 1901 only 621,824 acres were ceded and paid for; that it had been represented to them at the time the agreement was signed that the Government would settle with them later for the remainder of their lands, and that this had not been done. In view of these facts which are fully disclosed in the report of the House Committee recommending the passage of the jurisdictional act it is perfectly clear that the committee did not intend that the act waive the legal effect of the settlement and release under the agreement of 1901. The Indians in their representations to Congress did not ask that the settlement and release under the agreement of 1901 be waived, the committee did not so recommend, and the jurisdictional act does not so provide either in express terms or by necessary implication.
In Klamath and Moadoc Tribes et al. v. United States, 81 C. Cls. 19, these same plaintiffs under the instant jurisdictional act sought recovery of the value of certain of their lands within the limits of this identical reservation, which through a mistake had been disposed of by the Government, to other parties in 1906. Cangress in 1908 (35 Stat. 70, 92) appropriated the sum of $108,150 as payment for the lands so disposed of, payment of which sum was conditioned upon the execution by the Indians of a release of any and all claims and demands against the United States for such lands. The required release was duly executed by the Indians and the money so appropriated was paid to and accepted by them. Plaintiffs in that case, as in the instant case, made the contention that the jurisdictional act waived the defense of the *627 settlement and release. In deciding this contention adversely to plaintiffs the court said:
A review of the many cases decided by this court discloses, we think, that when Congress intends to waive a defense it has left no room to doubt the intention. * * * When Congress intends, as the cases indicate, to waive the effects of settlements and awards, apt language is used to accomplish the purpose.
‡ ‡ $
In this case we have not only a payment made and accepted, but a written release, comprehensive in terms, which was intended to and did extinguish any existing liability. No future claim could be based upon the transaction unless Congress waived the legal effect thereof. The issue here is not alone one of payment working an estoppel, but the setting aside of a release which admittedly closed the transaction and extinguished all liability under the claim. If Congress intended to nullify a release it would have used language clearly evidencing that intention. In the choice of legál terms we cannot assume that Congress intended to set aside a release by using the words “payment upon a claim.” Judicial precedents, quite familiar, limit the court in construing special jurisdictional acts to “the plain letter of the law conferring jurisdiction.”
The court held that the jurisdictional act did not extend to the claim and dismissed the petition. The Supreme Court affirmed the decision of the court in Klamath and Moadoc Tribes of Indians et al. v. United States, 296 U. S. 244. The court said:
This claim is plainly not, within the meaning of § 1, for an amount due under treaty, agreement or law of Congress or for misappropriation of funds of the Indians. Plaintiffs maintain that it is covered by the clause: “for the failure of the United States to pay said Indians any money or other property due.” There is here involved no question as to the adequacy of that language to cover any of the claims referred to in plaintiffs’ application to the Congress; we are considering whether it extends to this claim assuming that prior to the enactment it had been effectively released. If the release stands, no money or property is due plaintiffs, for the settlement and release wiped out the claim. If the Act is sufficient to give jurisdiction of *628 this claim, then it permits plaintiffs to bring into, the Court of Claims for determination de novo all claims, whether released or not, that they ever had against the United States, excepting only those already there determined. It goes without saying that, if Congress intended to grant so sweeping and unique a privilege, it would have made that purpose unmistakably plain.
* # * * *
* * * the jurisdictional Act does not extend to the claim in suit and the Court of claims rightly dismissed the case.
The decisions cited are directly in point in the instant case and must control the disposition of the claim under consideration. Plaintiffs’ claim for additional compensation for the 621,824 acres of land ceded to the defendant on the ground that the payment therefor was inadequate does not come within the jurisdictional Act, the agreement of 1901 and the release executed thereunder having accomplished a complete settlement of all claims of plaintiffs arising out of that transaction.
The remaining claims involved as heretofore stated, are predicated upon the alleged error of the Boundary Commission in the establishment of the outboundaries of the reservation resulting in the exclusion therefrom of 805,400-acres in addition to the 621,824 acres ceded to the United States under the agreement of 1901. It is asserted in the petition and before the court in the argument that plaintiffs have not been compensated for the additional 805,400' acres and that it was represented to them at the time the’ agreement of 1901 was signed that the Government would later on settle with them for the remainder of their lands. These claims being based on the alleged breach of the treaty of 1864 by the defendant come within the terms of the jurisdictional act, the court being called upon to construe the agreement of 1901 and determine whether or not the settlement agreement and release therein is inclusive of the claim for the additional lands here asserted.
The plaintiffs contend the description of the Klamath. Reservation set forth in the treaty of 1864 is indefinite,, confused, and irreconcilable in some of its calls, and cannot be literally followed, and that the treaty being con *629 fused and irreconcilable in some of its calls the court, must construe the language so as to effectuate the intention of the parties, giving special weight to the understanding of the Indians. It is asserted that the Boundary Commission in its determination of the boundary did not correctly construe the language of the treaty, and ignored in large part the understanding of the Indians.
The reservation boundaries as claimed by the plaintiffs are shown on a map prepared for them by a surveyor named Eugene B. Henry, in the year 1923 or 1924, revised October 31, 1931. The boundaries as shown on this map are as follows:
Beginning at the Point of Bocks, known to the Indians as Kal-wal, on the eastern shore of the upper - Klamath Lake, about twelve miles below the mouth of Williamson Biver; thence across said lake in a westerly direction to Kom-kom-la (Little Aspen Butte); thence north along the summit of the range through Posk-nect-kas (Aspen Butte)-, Mon-gin-na (Pelican Butte) and Jon-doles (Klamath Point) ; thence following the range around the south side of Gay-was (Crater Lake), to Tum-sum-ne (Mt. Scott); thence north along the range to His-chok-wal-as (Mt. Thielson); thence north to Ba-la-wisk-se; thence easterly to Tsne-wheel-stó-e-los (Walker Mountain); thence easterly to Ba-ha (Bald Mountain); thence southeasterly to Chok-chok-lisk-se (Hager Mountain) ; thence easterly to Bal-bal-is-ki or xin-a-del-wis (Lead Indian Mountain), the northern end of Winter Bidge; thence in a southerly direction along the summit of Winter Bidge to Wol-lock-se-klos (Gearhart Mountain) ; thence east and south along the ridge east of the headwaters of the streams flowing into Sprague Biver to the headwaters of Ish-tish-ea-wax Creek at Eo-lum-na; thence westerly to We-leej (Horse Fly Mountain); thence southwesterly to No-sult-ga-ga (Bonanza); thence in a westerly direction to Mo-yunt (Moyina Hill); thence westerly to Da-plum-ini (Plum Hills), the southern end of the mountain the extremity of which forms the Point of Bocks (Kal-wal); thence along said mountain through a high plateau or flat called Mbok-wals to the Point of Bocks (Kal-wal), the place of beginning.
The various points in the boundary lines as shown by Henry on his map were fixed on the basis of information *630 furnished him by the Indians as to what the Indians understood the boundaries of the reservation were at the time it was created in 1864. Plaintiffs have sought to show by the oral testimony of many witnesses that the boundary lines shown on the Henry map were the boundary lines as they were understood by the Indians. These witnesses, in the main aged members of the tribe, testify as to what they were told in their youth in respect to the reservation boundaries. Typical of the testimony of these witnesses is that of Yank Lobert:
Question. Mr. Lobert, you say you are 76 years old; and the treaty was made in 1864. That would make you about 10 or 11 years old at the time of the treaty. Is that right?
Answer. That’s it. Yes.
Question. Do you remember the council at which “ the treaty was made?
Answer. Yes.
Question. Were you present at the time — were you present in council where the treaty was being made?
Answer. Yes.
Question. State whether or not you were told after the treaty was made that a reservation was or had been set apart for the Indians.
Answer. I heard about it.
Question. Do you know where the reservation lines were fixed?
Answer. Yes; not all; one side and some more.
Question. Can you state where the lines are that you know?
Answer. I knew a few mountains; that is all.
Question. From whom did you learn where the boundary line was; who told you the boundary line?
Answer. Some of our chiefs — La Lakes.
The witness in answer to leading questions propounded by plaintiffs’ counsel identified several points as being on or within the boundary lines of the reservation, notwithstanding the fact that he made such identification on information imparted to him more than sixty years before that time. Manifestly, this character of testimony is *631 largely, if not entirely, without probative value. We have examined with care the oral testimony of plaintiffs’ witnesses in respect to the understanding of the Indians as to the boundaries of the reservation at the time it was created,, and, without further detailed consideration of that testimony here, we are clearly of the opinion that it falls far-short of establishing that the Indians at the time of the treaty understood the boundaries of the reservation to be those shown on the Henry map.
Moreover, we think the record justifies the conclusion that the boundary lines of the reservation fixed by the Boundary Commission were in substantial conformity to the understanding of the Indians as to such boundaries. It is clear from the report of the Commission that the understanding of the Indians as to the boundary was given careful consideration, and not ignored in large part as contended by plaintiffs. The Commission upon its arrival at the reservation met all the surviving Indian signers of the treaty living in the vicinity of the Klamath Agency and procured sworn statements from them. It then proceeded to explore the entire territory in dispute. Accompanied by a guide delegated by the Indians to point out the various locations under their Indian names the Commission then spent six weeks traveling by wagon, horseback, and afoot, visiting all the disputed points. There can be no doubt from the report of the Commission that its investigation of all controversies growing out of the previous erroneous surveys was. painstaking and thorough. The Indians made no protest to the report of the Boundary Commission when it was filed,, which they undoubtedly would have done had the boundary lines established by it been unsatisfactory to them,. The long continued and ever increasing complaints of the Indians in respect to the boundary lines of the reservation as fixed by the surveys of 1871 and 1888 ceased immediately upon the filing of the report of the Boundary Commission.. The agreement of 1901 was not approved by Congress until 1906. During the interval between the execution of the-agreement and its ratification by Congress numerous requests and memorials were presented by the Indians urg *632 ing the ratification of the agreement and no claim was made at any time that the Boundary Commission had failed to establish the boundaries of the reservation as set forth in the treaty and as understood by the Indians. The conclusion is inescapable that the reservation boundary lines established by the Boundary Commission were entirely acceptable to plaintiffs and in conformity with their understanding of the boundaries as provided by the treaty. The conclusion is equally manifest that the Indians regarded the agreement of 1901 and the release executed thereunder as a final and complete settlement of all their claims and demands against the defendant growing out of the controversies in respect to the boundaries of their reservation. The proof does not sustain the contention of plaintiffs that the reservation boundary lines established by the Boundary Commission were erroneous.
Plaintiffs are not entitled to recover and an order will be entered dismissing the petition.
Whaley, Judge; LittletoN, Judge; Greek, Judge; and Booth, Chief Justice, concur.