327 So.2d 272 (1976)
Leon TUBBY
v.
STATE of Mississippi.
No. 48799.
Supreme Court of Mississippi.
January 27, 1976.
Rehearing Denied February 24, 1976.
*274 Edwin R. Smith, Philadelphia, for appellant.
A.F. Summer, Atty. Gen., by Ben H. Walley, Asst. Atty. Gen., Jackson, for appellee.
Before INZER, WALKER and BROOM, JJ.
RODGERS, Presiding Justice.
This case came to this Court from the Circuit Court of Neshoba County, Mississippi. The appellant Leon Tubby was convicted of arson and sentenced to serve a term of five (5) years in the Mississippi State Penitentiary. He has appealed to this Court and now contends that the judgment of the trial court should be reversed because, it is said, that (1) the trial court did not have jurisdiction to try a Choctaw Indian for crimes committed in "Indian country;" and (2) the grand jury had no authority to return an indictment at the next term of court after the term for which it was originally impanelled. It is argued that in any case the grand jury was "all white," that Negroes and Indians were systematically excluded from the grand juries of Neshoba County.
The appellant, Leon Tubby, a Choctaw Indian was indicted by an all-white Neshoba County Grand Jury at the September, 1974 Term of court for having committed arson on a dwelling house, the property of Emma T. Anderson, a Choctaw Indian, in July of 1974. The land was acquired by a deed of conveyance by which an undivided one-eighth (1/8) interest of Kenneth Rea and the undivided one-eighth (1/8) interest of Donna Rea were conveyed to Emma Tuffamah Anderson, and a warranty deed whereby the undivided six-eighths (6/8) interest of Mrs. Evelyn Rea and Jimmy Rea was likewise conveyed to Emma Tuffamah Anderson. The documents were signed and delivered January 19, 1963, and were duly recorded in Land Record Deed Book A-57 at pages 308 and 310, respectively. The land was purchased for Emma Anderson, a Choctaw Indian, with trust funds held by the United States, subject to disbursement under the supervision of the Secretary of the Interior. Appellant filed a Motion to Dismiss for Lack of Jurisdiction upon the ground that this arson allegedly took place on Indian Allotment Land which allegedly under the authority of 18 U.S.C.A. Indians § 1151(c), at 51 (1966), is "Indian country." The defense contended that the "Major Crimes Act," 18 U.S.C.A. Indians § 1153, at 69 (1966) made the crime, when committed by an Indian, cognizable only in the federal court system. The trial court overruled this motion, and it is now before us for consideration on this appeal.
The trial court also overruled defendant's Motion to Quash the Indictment because of allegedly systematic exclusion of Indians and Negroes from the grand jury. At the hearing on the Motion to Quash, it *275 was stipulated that the grand jury indicting Leon Tubby was the same grand jury that had been convened for the September, 1973 Term of the circuit court and that it was subsequently recalled for both the February, 1974 Term and the September, 1974 Term. The jury returned a verdict of "guilty," and the defendant was sentenced to the Mississippi State Penitentiary at Parchman for a period of five (5) years. Defendant's Motion for a New Trial was overruled; whereupon, an appeal to this Court has been perfected.

APPLICABLE LAW
Reviewing the alleged errors as presented by the appellant, we find no reversible error in the contention that there has been a systematic exclusion of the Negroes and Indians from the grand juries of Neshoba County. The stipulation of the state and defendant shows that there are only seven hundred and twenty-four (724) adult Choctaw Indians in Neshoba County, and since the names of prospective jurors must be drawn from the list of voters, or persons who own real estate [Mississippi Code Annotated § 13-5-1 (1972)][1] it is difficult to get the names of persons who do not vote and do not own real property. Nevertheless, the record before us shows that Indians and Negroes were on the jury venire from which the grand jury was drawn. Moreover, since this case must be reversed, this issue may not be presented on a new trial.
The second assignment of error wherein the appellant contended during the trial, and now contends here, that the indictment is void, is well taken. A grand jury may be impanelled at a regular term of court, and it may be recalled at any time before the next criminal term of court in term time or in vacation, but when a new criminal court is convened, a new grand jury must be impanelled. The old grand jury may, however, report indictments obtained in vacation when it makes its final report for final discharge, but, the old grand jury cannot hear evidence and obtain indictments at the second term of the criminal court.
Section 2436, Mississippi Code Annotated 1942 (Rec. 1956) is not applicable to the *276 facts in this case since the indictment was returned by a body of men who were no longer authorized to act as grand jurors. See Joyce v. State, Miss., 327 So.2d 255, 1976.
We, therefore, sustain the appellant's motion to strike the indictment here involved.
Since the jurisdiction of the trial court has been challenged to try the appellant, a Choctaw Indian, for a crime alleged to have occurred in "Indian country" against another Choctaw Indian, we are constrained to discuss this issue for the guidance of the trial court on a new trial, if any, of this case.
The appellant contends that the property here involved is "Indian country" under the alleged authority of 18 U.S.C.A. Indians § 1151(c), at 51 (1966).[2]
He then argues that 18 U.S.C.A. Indians § 1153, at 69 (1966) gives exclusive jurisdiction to the federal court to try the major crimes listed therein, including the charge here involved. The section was amended. See Footnote.[3]
The appellant's contention is that since the United States has authority under Art. I, § VIII(3), U.S.Const.[4] to regulate commerce with "the Indian Tribes" it has authority to purchase land in a state with money due the tribe and thereby obtain exclusive criminal jurisdiction over the land so purchased.
The appellant cites several cases which, in our judgment, do not apply. The case of United States v. Klamath and Moadoc Tribes of Indians, et al., 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219, 86 Ct.Cl. 614 (1938), simply holds that although the Indians in that reservation are wards of the government, nevertheless, the government could not swap their land for other land and cut their timber without their consent and without compensation.
The appellant cites Wolfe v. Phillips, 172 F.2d 481 (C.A. 10th Okl. 1949), to support his argument that "the power of Congress to legislate with respect to its Indian wards is paramount and plenary." This case arose in Oklahoma where the five civilized tribes were located. These tribes included the Choctaw Indians who elected to move *277 west by choice under the terms of the Dancing Rabbit Creek Treaty.
The state of Oklahoma passed a law making their statute of limitations applicable to the five civilized tribes. The court in that case held that the state could pass laws where the federal government had not enacted laws with respect thereto.
The case of In re Colwash, 57 Wash.2d 196, 356 P.2d 994 (1960), dealt with a minor of the Yakima Indian tribe. The sole question presented to the Supreme Court of Washington was whether the juvenile court of Yakima County had jurisdiction over minor children, including Indian children of the Yakima tribe. The Washington Supreme Court held that the United States Court had jurisdiction of the children of this Indian tribe.
Obviously these cases are not authority to support the contention of the appellant under the facts here presented for our consideration.
The fallacy of appellant's argument begins with his theory that the property here involved is "Indian country." Appellant points to 18 U.S.C.A. Indians § 1151, at 51 (1966)[3] in support of his claim. This portion of § 1151 is in the following language: "(c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." (Emphasis added) Obviously, this means land, and rights-of-way running through the same, where the Indian titles to which have not been extinguished. This could not mean money held by the government due to individual Indians with which the United States has purchased land in a sovereign state of the union where the Indian title to such land has been extinguished by treaty and government patents to individuals.

I.
There are at least four reasons why the property here involved is not "Indian country."
First, the Choctaw Indian tribe ceded to the United States all their lands in Mississippi on September 27-28, 1830, and this treaty [except for the first paragraph thereof] was ratified by the Congress on February 24, 1831. See 7 Peters' Comp. 333.[5]
*278 The cession of Indian property to the general government extinguished all rights and titles the Indians had in land in Mississippi except that patented to individual Indians. See Minter v. Shirley, 45 Miss. 376 (1871); Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903); New York Indians v. United States, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927 (1898); Best v. Polk, 85 U.S. [18 Wall.] 112, 21 L.Ed. 805 (1873); Strother v. Cathey, 5 N.C. 162 (1807).
The Choctaw Indian Nation moved out of Mississippi into Arkansas and finally into the Oklahoma Territory where it became one of the five civilized tribes. The tribe lived on its own reservation in Oklahoma until its territory was broken up and patented to individual Indians.
The land ceded to the United States by the Choctaw Nation was patented many years ago to persons who moved into the Choctaw territory. The Indians who remained in Mississippi became citizens of Mississippi and subject to the laws of this state. The lands allotted to the Indians under the fourteenth section of the Dancing Rabbit Creek Treaty and supplemental parts of the treaty were held for a time by the government, but finally patents were issued to the Indians or their successors in title. There was no Indian reservation retained for the use and benefit of the Choctaw Indian tribe. In fact, there was no Indian tribe left in Mississippi. All Indians remaining in Mississippi became citizens of the state. They were made citizens by Article 14 of the Dancing Rabbit Creek Treaty and became subject to the laws of Mississippi under authority of Amend. XIV, § 1, U.S.Const. See United States v. Payne, 8 F. 883 (Dist.Ct.W.D. Ark. 1881); Clark v. Bates, 1 Dak. 42, 46 N.W. 510 (1874), affirmed 95 U.S. 204, 24 L.Ed. 471 (1877); United States v. Certain Property and William Bichard & Co., 1 Ariz. 31, 25 P. 517 (1871).
Moreover, the Mississippi Legislature had assumed civil and criminal jurisdiction over the Indian country in this state as early as January 13, 1830. Hutchinson's Code, Ch. 5, Art. 14, at 136 (1848).[6]
*279 We held in Fisher v. Allen, 3 Miss. [2 How.] 611 (1837), that the Mississippi law (1830) abolished the tribal customs of the Indian tribes in Mississippi and extended the state law over the territory ceded by the Indian tribes. The courts of this state since the Dancing Rabbit Creek Treaty have tried many cases involving Indians, not only criminal cases, but civil cases as well.
We held in the case of Anderson v. Lewis, 1 Freem. Ch. 178 (1843), that an Indian citizen of this state could file suit in the chancery court to set aside a sale of allotted land on the ground of fraud.
In Saffarans v. Terry, 12 Smides & M. [20 Miss.] 690 (1849), we held that patented lands allotted to an Indian were subject to execution.
We held in New Orleans J. & G.N.R. Co. v. Moye, 39 Miss. 374 (1860), that the Mississippi statute of limitations ran against an Indian claim to lands in this state. Civil and criminal process served on Mississippi Indians has never been questioned by the United States, and until recently, Mississippi jurisdiction over its Indian citizens has never been questioned by individuals.
The early statutory definition of "Indian country" as set forth in 4 Stat. at L. 729 (1846) was as follows:
"[A]ll that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi river, and not within any state to which the Indian title has not been extinguished." See 22 CYC 139.
Although this early definition was omitted from the United States Revised Statutes, nevertheless, the United States Supreme Court has held that it could be referred to for the purpose of determining the meaning of the term. United States v. Le Bris, 121 U.S. 278, 7 S.Ct. 894, 30 L.Ed. 946 (1887); Ex parte Crow Dog, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883). See also Palcher v. United States, 11 F. 47 (Circuit Court, D.Minn. 1882).
It is therefore apparent that the Congress at that time intended "Indian country" to be largely west of the Mississippi River and in states east of the river where the Indians had not ceded their land to the general government.
There are many cases from states west of the Mississippi River, both federal and state, which hold that crimes committed on Indian lands which had been part of an Indian reservation but which had been patented to individuals were not within the exclusive jurisdiction of the United States courts. See Tooisgah v. United States, 186 F.2d 93 (C.A. 10th 1950). The Court said in that case:
"In the resolution of that question [Indian country] it is important to keep in mind that when in 1907, the Territory of Oklahoma was admitted into the Union upon an equal footing with the original states, it thereby acquired full and complete jurisdiction over all persons and things within its boundaries, including the Indians, except to the extent that the *280 federal government expressly retained or asserted paramount jurisdiction over them as guardian and ward. See United States v. McBratney, 104 U.S. 621, 26 L.Ed. 869; Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419." 186 F.2d at 96-97.
In Williams v. State, Okl.Cr., 393 P.2d 887 (1964), the Court said in a well-reasoned opinion quoting from Ellis v. State, Okl.Cr., 386 P.2d 326 (1963):
"Where tribes occupying reservation ceded lands embraced within it to United States, relinquishing and surrendering all their claim, title and interest subject to allotments in severalty, and every allottee was given benefit of and made subject to laws, both criminal and civil, of state or territory, with gift of citizenship and equal protection of laws, Congress thereby intended to dissolve tribal reservation, and assimilate the Indians as citizens of state or territory. O.S. 1961 Const. Art. 1, § 3; 18 U.S.C.A. §§ 1151-1153." 393 P.2d at 889.
See also Alexander Bird in the Ground v. District Court of Thirteenth Judicial District of the State of Montana, 239 F. Supp. 981 (U.S.D.C.D., Mont.Billings Div. 1965); Ellis v. Page, 351 F.2d 250 (C.A. 10th 1965); State v. Mendez, 57 Nev. 192, 61 P.2d 300 (1936).
North Carolina court retained jurisdiction over a defendant, an enrolled unemancipated member of the Eastern Band of Cherokee Indians, with respect to crime of arson and felonious breaking and entry allegedly committed on Cherokee Indian Reservation and involving building owned by Cherokee Indian. In re McCoy, 233 F. Supp. 409 (D.C.N.C. 1964).
In the concurring opinion in the case of McMillan v. Tate, 260 So.2d 832 (Miss. 1972), we pointed out the holding of the United States Supreme Court in Choctaw Nation v. United States, 119 U.S. 1, 7 S.Ct. 75, 30 L.Ed. 306 (1886), in which the United States Court of Claims had decided the questions of the claims of the Choctaw Indian Nation under the terms of the Dancing Rabbit Creek Treaty. In that case, the Supreme Court made the following observation:
"`... [Under the pressure of the demand for the settlement of the unoccupied lands of the state of Mississippi by emigrants from other states, the policy of the United States in respect to the Indian tribes still dwelling within its borders underwent a change, and it became desirable, by a new treaty, to effect, so far as practicable, the removal of the whole body of the Choctaw Nation, as a tribe, from the limits of the state to the lands which had been ceded to them west of the Mississippi river. To carry out that policy the treaty of 1830 was negotiated.' 119 U.S. at 36-37, 7 S.Ct. at 95, 30 L.Ed. at 318. (Emphasis added)." 260 So.2d at 835.
Thus, the Supreme Court in that case recognized the fact that no Choctaw tribe, as such, remained in Mississippi after the land cession in the Dancing Rabbit Creek Treaty.
Although it may be said that the federal government has the authority to control the activity of Indian wards, this is not true as to citizens of a state who have moved into the social and civic activities of a normal citizen of a state, they then become subject to the criminal jurisdiction of that state. Kitto v. State, 98 Neb. 164, 152 N.W. 380 (1915); State v. Nimrod, 30 S.D. 239, 138 N.W. 377 (1912).
This thesis is very well articulated by the author of 42 C.J.S. Indians § 79b(2), at 798-99 (1944):
"The United States has never attempted to punish its Indian wards for crimes committed within the limits of a state but outside a reservation, and even before he became a citizen, if an Indian committed a crime within a state and without his reservation, he was amenable to the criminal laws of the state and subject *281 to the jurisdiction of its courts. The express consent of congress is not essential to the exercise of state jurisdiction over crimes committed by Indians when off the reservation. The state courts exercise exclusive jurisdiction over crimes committed by tribal or other Indians within the state and outside the limits of any Indian reservation, where there are no statute or treaty provisions granting or retaining jurisdiction in favor of the United States. Where the United States has relinquished title to former Indian lands within a state, the state courts have jurisdiction over offenses committed thereon even though by an Indian ward of the government, as in the case of an offense committed by an Indian on fully patented lands within the exterior boundaries of an Indian reservation, which lands are regarded as not within the limits of an Indian reservation in the sense that would give federal courts exclusive jurisdiction, as in the case of offenses committed on lands owned in fee by individual Indians, as discussed supra subdivision b(1) of this section, or on lands withdrawn from an Indian reservation by act of congress. It has been held that a state court has jurisdiction of the prosecution of an Indian for an offense committed outside the exterior boundaries of an Indian reservation but within the ceded territory as contemplated by treaty."
The above named authority goes on to say:
"Where the federal government acquires lands from private persons, pursuant to a statute relating to allotments to Indians who refused to leave a given state and go into Indian territory, and the lands consist of separate noncontiguous parcels on which the Indians settled individually under allotments, and not as a community, such an allotment is not Indian country in the sense which would deprive the state of criminal jurisdiction, and an Indian residing on such an allotment may be punished under state law for an act committed on such land and declared criminal under state law. The United States courts have not exclusive jurisdiction over an offense committed by one Indian against another Indian on an Indian allotment on the public domain outside the boundaries of any reservation and within the limits of the state." 42 C.J.S. Indians § 79b(2), at 799 (1944).
We must conclude, therefore, that all "Indian country" was extinguished by the land patents issued to the individual Indians under the terms of the Dancing Rabbit Creek Treaty.

II.
The question then arises as to whether or not the United States government is authorized by the Constitution of the United States to purchase land in a sovereign state of the union, without its consent, for the purpose of giving the land to a Choctaw Indian citizen who resides in the state, so as to deny the state criminal jurisdiction over crimes committed by an Indian on the purchased land.
Art. I, § VIII(17), U.S.Const. is in the following language:
"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; ..."
This section simply means that in order to obtain jurisdiction over lands in Mississippi it is necessary first to obtain the consent of the Legislature of this state to so do. See Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963).
*282 In the case of Silas Mason Co., et al v. Tax Commission of Washington, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187 (1937), the United States Supreme Court pointed out that the acquisition by the United States of exclusive jurisdiction over land to which it has acquired title within a state is dependent upon the consent of the state.
In Surplus Trading Company v. Cook, Sheriff, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930), the Supreme Court of the United States made the following observation:
"It is not unusual for the United States to own within a state lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the state. On the contrary, the lands remain part of her territory and within the operation of her laws, save that the latter cannot affect the title of the United States or embarrass it in using lands or interfere with its right of disposal.
A typical illustration is found in the usual Indian reservation set apart within a state as a place where the United States may care for its Indian wards and lead them into habits and ways of civilized life. Such reservations are part of the state within which they lie and her laws, civil and criminal, have the same force therein as elsewhere within her limits, save that they can have only restricted application to the Indian wards. Private property within such a reservation, if not belonging to such Indians, is subject to taxation under the laws of the state. Another illustration is found in two classes of military reservations within a state  one where the reservation, although established before the State is admitted into the Union, is not excepted from her jurisdiction at the time of her admission; and the other where the reservation, although established after the admission of the state, is established either upon lands set apart by the United States from its public domain or upon lands purchased by it for the purpose without the consent of the Legislature of the state. In either case, unless there be a later and affirmative cession of jurisdiction by the state, the reservation is a part of her territory and within the field of operation of her laws, save that they can have no operation which would impair the effective use of the reservation for the purposes for which it is maintained. If there be private property within such a reservation which is not held or used as an incident of military service it may be subjected to taxation like other private property within the state." (Emphasis added) 281 U.S. at 651, 50 S.Ct. at 456, 74 L.Ed. at 1094.
In the case of State v. Shepard, 239 Wis. 345, 300 N.W. 905 (1941), the Wisconsin Supreme Court held in a well-documented opinion that where the land on which the crime was committed was never within an Indian reservation, and although the land was allotted to the Indian defendant for his occupation and use, the title to the property was acquired by the United States without the consent of Wisconsin. It was therefore not within the exclusive jurisdiction of the United States. The court went further to say:
"In such case the United States is only a proprietor of the land, and the State's jurisdiction is unimpaired, except that it may not interfere with performance by the United States of its governmental function. Citing Silas Mason case, supra [302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187 (1937)]; Surplus Trading Co. case, supra [281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930)]; Williams v. Arlington Hotel Co., 8 Cir., 1927, 22 F.2d 669." 239 Wis. at 349, 300 N.W. at 907.
The State of Mississippi has given its consent for the United States to purchase certain land in Mississippi so as to acquire jurisdiction over the territory purchased, but it has not given its consent for the United States to acquire civil and criminal *283 jurisdiction over lands purchased by the government for use and benefit of the Choctaw Indians. See the following sections of Mississippi Code Annotated (1972):
"The consent of the State of Mississippi is given, in accordance with the 17th clause, 8th section, and of the 1st article of the Constitution of the United States, to the acquisition by the United States, by purchase, condemnation or otherwise, of any land in this state which has heretofore been or may hereafter be acquired for custom houses, post offices, or other public buildings." Miss. Code Ann. § 3-5-1 (1972).
"The governor, upon application made to him in writing, on behalf of the United States, for the purpose of acquiring and holding lands or using any part of a public road of any county within the limits of this state, for the purpose of making, building, or constructing levees, canals, or any other works in connection with the improvement of rivers and harbors, or as a site for a fort, magazine, arsenal, dockyard, courthouse, custom house, lighthouse, post office, or other needful buildings, or for the purpose of locating and maintaining national military parks, or for any other public works or purposes accompanied by proper evidence of the purchase of such lands, or the consent of the board of supervisors of the proper county for such public roads to be used for said purpose, is authorized for the state to cede jurisdiction thereof to the United States for the purpose of the cession and none other." Miss. Code Ann. § 3-5-3 (1972).
"The exclusive jurisdiction in and over any land which has heretofore been, or may hereafter be, so acquired by the United States is hereby ceded to the United States for all purposes, except that the state retains the right to serve thereon all civil and criminal processes as provided in section 3-5-9. The jurisdiction ceded hereby shall not vest until the United States shall have acquired title to the lands by purchase, condemnation, or otherwise, and shall continue no longer than the United States shall own such lands for the purposes for which acquired." Miss. Code Ann. § 3-5-5 (1972).
"The concession of jurisdiction to the United States over any part of the territory of the state, heretofore or hereafter made, shall not prevent the execution on such land of any process, civil or criminal, under the authority of this state, nor prevent the laws of this state from operating over such land; saving to the United States security to its property within the limits of the jurisdiction ceded." Miss. Code Ann. § 3-5-9 (1972).
"The several courts of justice organized under the constitution and laws of this state, shall possess the sole and exclusive jurisdiction of trying and punishing all persons in the manner prescribed by law, for crimes and offenses committed in this state, except such as are exclusively cognizable by the courts deriving their jurisdiction from the constitution and laws of the United States." Miss. Code Ann. § 99-11-1 (1972).
An example of the method used by the Mississippi Legislature in granting jurisdiction over territory acquired by the United States may be found in Mississippi Code 1942 Annotated § 5970 (Rec. 1952),[7] *284 in which the United States obtained concurrent civil and criminal jurisdiction over the Natchez Trace Parkway.
Inasmuch as the State of Mississippi has not consented to the acquisition of territory within this state for the purpose of establishing Indian reservations by the United States, through the Secretary of Interior, the State of Mississippi has not lost civil and criminal jurisdiction over such land so purchased, or the Indian citizens living thereon.

III.
If it is argued, however, that the Mississippi Indians are under the jurisdiction of the federal government because of an act of Congress passed in 1934 under the heading "An Act  to conserve and develop Indian lands and resources; to extend to Indians the right to form business and other organizations; to establish a credit system for Indians; to grant certain rights of home rule to Indians; to provide for vocational education for Indians; and for other purposes. 73d Congress. Sess. II Ch. 576, 1934" [48 Stat. 984] this argument must fail, because this law does not take away the criminal jurisdiction over land so acquired or its Indian citizens. The following sections are self-explanatory:
"Sec. 7. The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add such lands to existing reservations: Provided, That lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to residence at such reservations." 25 U.S.C. § 467
However, one should note the language of the last paragraph of this act:
"Sec. 19. The term `Indian' as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. The term `tribe' wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. The words `adult Indians' wherever used in this Act *285 shall be construed to refer to Indians who have attained the age of twenty-one years." 25 U.S.C. § 479.
From this language, it appears that the Choctaw Indians of Mississippi do not fall within the provided-for class. It is apparent that the Indians who are to benefit from the act must be living on a reservation prior to June 1, 1934, over which the federal government had jurisdiction. There were no Indian reservations in Mississippi at that time, since by the Treaty of Dancing Rabbit Creek all the Choctaws who remained became citizens of Mississippi and were not given the status of reservation Indians. The Choctaws who moved west were the only Indians who acquired the status "reservation Indians."
Assuming, however, that the Secretary of the Interior is acting under the authority of Congress to purchase land to aid the Indians of Mississippi, rather than in payment of the annuity, this does not mean that the federal courts have exclusive jurisdiction of Mississippi Indian citizens simply because they are being aided by the federal government. The State of Mississippi has not relinquished jurisdiction over the acquired territory or its citizens.
Moreover, the Congress of the United States enacted what is now 25 U.S.C.A. Indians § 349 in 1887, in which the Congress expressly stated that the Indians would become subject to state law when the government issued patents to their lands.[8]See People v. Pratt, 26 Cal. App.2d 618, 80 P.2d 87 (1938); State v. Big Sheep, 75 Mont. 219, 243 P. 1067 (1926).

IV.
There is yet another reason why the State of Mississippi has criminal and civil jurisdiction over its Indian citizens.
In 1953, the Congress exempted six states of the United States from the reserved "sole and exclusive jurisdiction of the United States over the major crimes committed in `Indian country'" [18 U.S.C.A. Indians § 1162, at 32 (Supp. 1975)] as defined by 18 U.S.C.A. Indians § 1151, at 51 (1966). Indian reservations had been established out of government lands in these states. Some of the western states relinquished criminal and civil jurisdiction over lands occupied by Indians as an Indian reservation. See Kills Plenty v. United States, 133 F.2d 292 (C.A.8th 1943).
In addition to the jurisdiction conferred by the Congress upon the states named in 18 U.S.C.A. Indians § 1162 the Congress enacted 25 U.S.C.A. Indians §§ 1321-24, at 176-180 (Supp. 1975), in an effort to give civil and criminal jurisdiction to all the other states over Indian affairs where the federal government had previously exercised exclusive jurisdiction, limited, however, to the consent of the Indian tribes.[9] *286 25 U.S.C.A. Indians § 1324, at 180 (Supp. 1975) is in the following language:
"Notwithstanding the provisions of any enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil or criminal *287 jurisdiction in accordance with the provisions of this subchapter. The provisions of this subchapter shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes, as the case may be."
This section applied largely to those states where the Congress reserved jurisdiction over the Indian land reservations in the enabling act organizing the state and which was incorporated into the state constitution or into its laws.
It was not necessary for Mississippi to amend its laws to assume jurisdiction over the territory of the Choctaws, since there was no Choctaw reservation in Mississippi.
However, the people of Mississippi did amend their constitution so as to permit "Indians not taxed" to vote. This was done in view of the fact that a great many Indians in this state were not paying state taxes.
Art. 12, § 241, Mississippi Constitution 1890 was originally in the following language:
"Every inhabitant of this State, except idiots, insane persons and Indians not taxed, who is a citizen of the United States [of America] twenty-one years old and upwards, who has resided in this State [for] two years, and one year in the election district, or in the incorporated city or town, in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of bribery, burglary, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, and who has paid on or before the first day of February of the year in which he shall offer to vote, all [poll] taxes which may have been legally required of him, and which he has had an opportunity of paying according to law, for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid such taxes, is declared to be a qualified elector; but any minister of the gospel in charge of an organized church or his wife legally residing with him, shall be entitled to vote after six months' residence in the election district, [incorporated City or town], if otherwise qualified."
The legislature also amended Mississippi Code 1942 Annotated Section 3235 (Rec. 1956) to implement this constitutional amendment.
The language of Art. 12, § 241, Mississippi Constitution 1890 was amended in 1972 to read as follows:
"Every inhabitant of this state, except idiots and insane persons, who is a citizen of the United States of America, eighteen (18) years old and upward, who has been a resident of this state for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector, except that he shall be qualified to vote for President and Vice President of the United States if he meets the requirements established by Congress therefor and is otherwise a qualified elector." Miss.Const., Art. 12, § 241.
If the State of Mississippi had been required to amend its Constitution to make Indians citizens of this state in all respects, the amendment has been made. All Indians residing in Mississippi are entitled to participate in the election of officers. The record in the instant case shows that they participate in the trial of cases in the state courts as jurors at the time the appellant was indicted.
*288 We conclude, therefore, that the courts of Mississippi have jurisdiction over the Indian citizens of this state in the same manner and to the same extent they have jurisdiction over other citizens of Mississippi.

CONCLUSION
We are of the opinion and so hold, that the trial court was in error in failing to sustain the Motion to Quash the Indictment because the grand jury who returned the indictment did so after its term of service had expired. We find no merit in the other assignments of error.
After a consideration of this case by a conference of the justices en banc, the judgment of the trial court is reversed, and the appellant is discharged, subject, however, to being held under bail bond to await the action of another grand jury of Neshoba County, Mississippi.
Reversed and appellant discharged.
GILLESPIE, C.J., and PATTERSON, INZER, SMITH, ROBERTSON, SUGG and BROOM, JJ., concur.
WALKER, J., specially concurring.
WALKER, Justice (specially concurring):
I agree with the conclusion reached by the majority that the appellant should be discharged.
I am also in full agreement with that portion of the opinion holding that the motion to quash the indictment should have been sustained because the grand jury which returned the indictment did so after its term of service had expired.
However, it is my opinion that the crime with which the appellant was charged was within the exclusive jurisdiction of the United States Government and that the State lacked criminal jurisdiction over this Choctaw Indian who burned the home of another Choctaw Indian located on an Indian allotment of land, which, in my opinion, comes within the definition of "Indian Country" as set out in 18 U.S.C. section 1151 (1970). See 18 U.S.C. §§ 1152, 1153, 1162 and 3242 (1970). For an excellent and exhaustive discussion of the question presented by the facts of this case, see Judge Goodman's opinion in Petition of Carmen for a Writ of Habeas Corpus, 165 F. Supp. 942 (N.D.Cal. 1958).
NOTES
[1] "Every citizen not under the age of twenty-one years, whso is either a qualified elector, or a resident freeholder of the county for more than one year, is able to read and write, and has not been convicted of an infamous crime, or the unlawful sale of intoxicating liquors within a period of five years and who is not a common gambler or habitual drunkard, is a competent juror. No person who is or has been within twelve months the overseer of a public road or road contractor shall, however, be competent to serve as a grand juror. The lack of any such qualifications on the part of one or more jurors shall not, however, vitiate an indictment or verdict. Moreover, no talesman or tales juror shall be qualified who has served as such talesman or tales juror in the last preceding two years, and no juror shall serve on any jury who has served as such for the last preceding two years. No juror shall serve who has a case of his own pending in that court, provided there are sufficient qualified jurors in the district, and for trial at that term.

In order to determine that prospective jurors can read and write, the presiding judge shall, with the assistance of the clerk, distribute to the jury panel a form to be completed personally by each juror prior to being empaneled as follows:
`1. Your name ____ Last ____ First ____ Middle initial
2. Your home address ____
3. Your occupation ____
4. Your age ____
5. Your telephone number ____ If none, write none.
6. If you live outside the county seat, the number of miles you live from the courthouse ____ Miles
 _______________________
 Sign your name'
The judge shall personally examine the answers of each juror prior to empaneling the jury and each juror who cannot complete the above form shall be disqualified as a juror and discharged.
A list of any jurors disqualified for jury duty by reason of inability to complete the form shall be kept by the circuit clerk and their names shall not be placed in the jury box thereafter until such person can qualify as above provided." Miss. Code Ann. § 13-5-1 (1972).
[2] "Except as otherwise provided in sections 1154 and 1156 of this title, the term `Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U.S.C.A. Indians § 1151, at 51 (1966).
[3] "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to kill, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

As used in this section, the offenses of rape and assault with intent to commit rape shall be defined in accordance with the laws of the State in which the offense was committed, and any Indian who commits the offenses of rape or assault with intent to commit rape upon any female Indian within the Indian country shall be imprisoned at the discretion of the court.
As used in this section, the offenses of burglary, assault with a dangerous weapon, assault resulting in serious bodily injury, and incest shall be defined and punished in accordance with the laws of the State in which such offense was committed." 18 U.S.C.A. Indians § 1153, at 25 (Supp. 1975).
[4] "3. To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S.Const. Art. I, § VIII(3).
[5] WITH THE CHOCTAW, 1830.
A treaty of perpetual friendship, cession and limits, entered into by John H. Eaton and John Coffee, for and in behalf of the Government of the United States, and the Mingoes, Chiefs, Captains and Warriors of the Choctaw Nation, begun and held at Dancing Rabbit Creek, on the fifteenth of September, in the year eighteen hundred and thirty.
* * * * *
Article I. Perpetual peace and friend ship is pledged and agreed upon by and between the United States and the Mingoes, Chiefs, and Warriors of the Choctaw Nation of Red People; and that this may be considered the Treaty existing between the parties all other Treaties heretofore existing and inconsistent with the provisions of this are hereby declared null and void.
* * * * *
ARTICLE III. In consideration of the provisions contained in the several articles of this Treaty, the Choctaw nation of Indians consent and hereby cede to the United States, the entire country they own and possess, east of the Mississippi River; and they agree to move beyond the Mississippi River, early as practicable, and will so arrange their removal, that as many as possible of their people not exceeding one half of the whole number, shall depart during the falls of 1831 and 1832; the residue to follow during the succeeding fall of 1833; a better opportunity in this manner will be afforded the Government, to extend to them the facilities and comforts which it is desirable should be extended in conveying them to their new homes.
* * * * *
ARTICLE XIV. Each Choctaw head of a family being desirous to remain and become a citizen of the States, shall be permitted to do so, by signifying his intention to the Agent within six months from the ratification of this Treaty, and he or she shall thereupon be entitled to a reservation of one section of six hundred and forty acres of land, to be bounded by sectional lines of survey; in like manner shall be entitled to one half that quantity for each unmarried child which is living with him over ten years of age; and a quarter section to such child as may be under 10 years of age, to adjoin the location of the parent. If they reside upon said lands intending to become citizens of the States for five years after the ratification of this Treaty, in that case a grant in fee simple shall issue; said reservation shall include the present improvement of the head of the family, or a portion of it. Persons who claim under this article shall not lose the privilege of a Choctaw citizen, but if they ever remove are not to be entitled to any portion of the Choctaw annuity." 7 Peters' Comp. 333 [7 Stat. 333].
[6] "ARTICLE 14. An act to extend the laws of Mississippi over the persons and property of the resident Indians, January 19, 1830.

§ 1. Their Government abolished. From and after the passage of this act, all the rights, privileges, immunities, and franchises, held, claimed, or enjoyed, by those persons called Indians, and their descendants, and which are held by virtue of any form of policy, usage, or custom, existing among said persons, not particularly recognized and established by the common law or statues [sic] of the State of Mississippi, be, and the same are hereby wholly abolished, and taken away.
§ 2. Citizenship granted them. All the rights, privileges, immunities, and franchises, held and enjoyed by free white persons, inhabitants of the said state, be, and the same are hereby given, granted, and extended, to the said persons called Indians, and their descendants, in as full and ample a manner, as the same can be done by act of the General Assembly.
§ 3. Laws extended over them. All the laws, statutes, and ordinances, now in force in the said State of Mississippi, be, and the same are hereby declared to have full force, power, and operation, over the persons and property of and within the territory now occupied by the said Indians.
§ 4. Their Marriages validated. All marriages, matrimonial connexions, or associations entered into by virtue of any usage or custom of the said Indians, and by them deemed valid, be, and the same are hereby declared to be as binding and obligatory, as if the same had been solemnized according to the laws of this state.
§ 5. Office of Chief abolished. Any person or persons who shall assume on him or themselves, and exercise in any manner whatever the office of chief, mingo, head man, or other post of power, established by the tribal statutes, ordinances, or customs, of the said Indians, and not particularly recognised by the laws of this state, shall, on conviction upon indictment, or presentment, before a court of competent jurisdiction, be fined in any sum not exceeding one thousand dollars, and be imprisoned any time not exceeding twelve months, at the discretion of the court before whom conviction may be had.
§ 6. Construction of Act of 1829. The boundaries specified in an act, entitled `an act to extend legal process into that part of the state now occupied by the Chickasaw and Choctaw tribes of Indians,' passed February 4, 1829, shall be so construed as to make all legal process returnable, as by that act required." Hutchinson's Code, Ch. 5, Art. 14, at 136 (1848).
[7] "The United States of America is authorized to acquire by deed or conveyance, gift, will or otherwise lands for the purpose of roadways and parkways as set forth in this Act, but this consent is given upon condition that the State of Mississippi shall retain a concurrent jurisdiction with the United States in and over such lands so far that civil process in all cases and such criminal process as may issue under the authority of the State of Mississippi against any person charged with the commission of any crime, without or within said jurisdiction, may be executed thereon in like manner as if this consent had not been given. Power is hereby conferred on the Congress of the United States to pass such laws as it may deem necessary for the acquisition of the said lands and for incorporation in national roadways, parkways or national parks, and to pass such laws and make or provide for the making of such rules and regulations, of both civil and criminal nature, and to provide punishment therefor as in its judgment may be necessary for the management, control and protection of such lands as may be acquired by the United States under the provisions of this Act, including such lands as are acquired not only for highway and parkway and park purposes but also those lands over which scenic easements are acquired for such purposes, provided, nevertheless, that such jurisdiction shall not vest in the United States of America unless and until it, through the proper officer or officers, notifies the Governor and, through him, the State of Mississippi that the United States of America assumes concurrent police jurisdiction over the land or lands thus deeded and conveyed. But, however, there is saved to the State of Mississippi the right to tax sales of gasoline and other motor vehicle fuels and oils for use in motor vehicles and to tax persons and corporations, their franchises and properties, on all land or lands deeded or conveyed as aforesaid, and saving, except to persons residing in or on any of the land or lands deeded or conveyed as aforesaid, the right to vote at all elections within the county in which said land or lands are located, upon like terms and conditions and to the same extent as they would be entitled to vote in such county had not such lands been deeded or conveyed as aforesaid to the United States of America." Section 5970, Miss.Code 1942 Ann. (Rec. 1952). (Emphasis added)
[8] "At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section 348 of this title, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law: Provided, That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent: Provided further, That until the issuance of fee-simple patents all allottees to whom trust patents shall be issued shall be subject to the exclusive jurisdiction of the United States: And provided further, That the provisions of sections 331-334, 339, 341, 342, 349 and 381 of this title shall not extend to any Indians in the Indian Territory." 25 U.S.C.A. Indians § 349, at 391-92 (1963).
[9] "(a) The consent of the United States is hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, with the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." 25 U.S.C.A. Indians § 1321, at 176 (Supp. 1975).
"(a) The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.
(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute, or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.
(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section." 25 U.S.C.A. Indians § 1322, at 177 (Supp. 1975).
"(a) The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to the provisions of section 1162 of Title 18, section 1360 of Title 28, or section 7 of the Act of August 15, 1953 (67 Stat. 588), as it was in effect prior to its repeal by subsection (b) of this section.
(b) Section 7 of the Act of August 15, 1953 (67 Stat. 588), is hereby repealed, but such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal." 25 U.S.C.A. Indians § 1323, at 178-79 (Supp. 1975).
"Notwithstanding the provisions of any enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil or criminal jurisdiction in accordance with the provisions of this subchapter. The provisions of this subchapter shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes, as the case may be." 25 U.S.C.A. Indians § 1324, at 180 (Supp. 1975).